UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:16-CV-00107-TBR

MARILYN CIMA                                                                                        PLAINTIFF

v.

MEDTRONIC, INC.                                                                                   DEFENDANT

**Memorandum Opinion and Order**

This case is before the Court upon Defendant Medtronic, Inc.'s motion to dismiss pursuant to Federal Rule of Procedure 12(b)(6). [DN 7.] Plaintiff Marilyn Cima has responded, [DN 8], and Medtronic has replied, [DN 10]. Fully briefed, this matter is ripe for adjudication. For the following reasons, Medtronic's motion to dismiss [DN 7] is GRANTED IN PART and DENIED IN PART.

**I. Facts and Procedural History[1]**

Marilyn Cima was terminated from her employment at Medtronic on September 17, 2014. [DN 1-1 at 3.] At the time of her termination, Cima had been employed by Medtronic for nearly fifteen years, eventually being promoted to the position of principal clinical specialist. [*Id.*] Cima's job responsibilities required her to travel between several hospitals in the western Kentucky area, including Baptist Health in Paducah. [*Id.* at 3-4.]

---

[1] Because this case is at the motion to dismiss stage, the facts are taken from Cima's complaint, her Medtronic Employment Agreement, her Separation Agreement and Release, and two items of communication addressed to Cima from her supervisor. *See Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997) (courts may consider documents attached to defendant's motion to dismiss when they are referred to in the plaintiff's complaint and are central to the plaintiff's claims).

In mid-2014, Cima "was accused of fraternizing with one [of] the doctors" at Baptist Health, with whom she had a relationship before coming to work for Medtronic. [*Id.* at 4-5.] Cima alleges that several of her coworkers and supervisors were aware of the relationship, and that other Medtronic employees had previously had undisclosed personal relationships with Medtronic customers. [*Id.* at 4.] After learning of the relationship, Medtronic supervisors "ordered [Cima] not to work at Baptist Health and [to] avoid any contact with that doctor during business hours." [*Id.* at 5.] Cima complied with her employer's instructions, but due to scheduling difficulties within the company, she was eventually placed back on-call at Baptist Health. [*Id.*]

Cima claims that "[t]he additional stress caused by her extra workload and the possibility that she might violate her employer's admonition" caused her to have "a severe anxiety attack." [*Id.*] She drove herself to Vanderbilt Hospital's emergency room on July 27, 2014, and was placed in the Vanderbilt psychiatric ward for an evaluation. [*Id.*] After completing a two-week program at Vanderbilt, Cima returned to work, but was terminated shortly thereafter "while still under her psychiatrist's supervision." [*Id.* at 6.] Cima "was not given a specific reason for her termination, other than being told of nebulous complaints from the hospitals where she worked." [*Id.*]

After her termination, Cima signed a severance agreement. [*Id.*] She alleges that at the time she signed, "she lacked the capacity to enter into a contractual agreement [] because of the psychological conditions that she was still

2

suffering from during the time that her employment ended." [*Id.*] When Cima saw that the funds from her severance package had been directly deposited into her bank account, she sent a check to Medtronic for that same amount. [*Id.* at 7.] Medtronic never cashed Cima's check, nor did it respond to Cima's repeated requests for information. [*Id.*] Cima filed this suit, alleging intentional infliction of emotional distress, breach of contract, and interference with a contractual relationship. [*Id.* at 7-10.]

Cima's complaint makes reference to, and depends upon, several documents. Her employment relationship with Medtronic was governed by the Medtronic Employee Agreement. *See* [DN 6-2 (filed under seal).] The Employee Agreement provides, among other things, that "Medtronic agrees to employ or continue to employ [Cima] at-will. The parties agree that either party may terminate [Cima's] employment at any time for any reason." [*Id.* at 4 (emphasis removed).] Cima does not disclaim the Employment Agreement, but rather claims that two communications from her supervisor, Stacie Blankenship, imposed additional contractual requirements. *See* [DN 1-1 at 8-9.] Those communications, sent on March 21 and April 22, 2014, respectively, outline Blankenship's expectations regarding Cima's work at Baptist Health and her relationship with the doctor. *See* [DN 6-3 (filed under seal); DN 6-4 (filed under seal).] Finally, Cima's Separation Agreement and Release with Medtronic contains a release of all her claims against Medtronic. [DN -1 at 3-4 (filed under seal).]

Medtronic removed this case from McCracken County, Kentucky Circuit Court, and then moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). Medtronic argues that Cima's claims are barred by the Separation Agreement and the doctrine of laches, and that even if they are not barred, Cima's claims fail on the merits. *See* [DN 7; DN 7-1.] Cima responded, [DN 8], and Medtronic replied, [DN 10]. Fully briefed, Medtronic's motion to dismiss is ripe for adjudication.

## II. Standard of Review

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In order to survive a motion to dismiss under Civil Rule 12(b)(6), a party must "plead enough factual matter to raise a 'plausible' inference of wrongdoing." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim becomes plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Should the well-pleaded facts support no "more than the mere possibility of misconduct," then dismissal is warranted. *Id*. at 679. The Court may grant a motion to dismiss "only if, after drawing all reasonable inferences from the allegations in the complaint in favor of the plaintiff, the complaint still fails to allege a plausible theory of relief." *Garceau v. City of Flint*, 572 F. App'x 369, 371 (6th Cir. 2014) (citing *Iqbal*, 556 U.S. at 677-79).

4

## III. Discussion

In support of its motion to dismiss, Medtronic raises several arguments. Medtronic contends that Cima's claims are barred by the Separation Agreement and Release and by the doctrine of laches. But Cima has plausibly alleged that she lacked the capacity to understand the consequences of signing the Separation Agreement, and the doctrine of laches does not bar Cima's claims. Similarly, Cima has plausibly alleged that Medtronic's representations to her altered her at-will employment status, and that its actions constituted extreme and outrageous behavior. Therefore, her breach of contract and intentional infliction of emotional distress claims survive Medtronic's motion. However, because Kentucky law does not recognize two-party contractual interference claims, her third claim must be dismissed.

### A. Cima's Separation Agreement

Medtronic first argues that Cima's claims are barred by the Separation Agreement and Release she signed after her termination. The Separation Agreement, executed by Cima on September 22, 2014, states that "Cima . . . fully and completely releases and forever discharges Medtronic . . . from any and all claims . . . which Cima [] ever had [or] now has against Medtronic." [DN 6-1 at 3.] In exchange for that release, Cima received a severance package of four weeks' salary and other various benefits. *See* [*id.* at 2-3.] Cima does not deny that she signed the Separation Agreement, but instead argues that her release was not voluntary under the totality of the circumstances. *See* [DN 8 at 3-6.]

5

Cima's release of her state-law claims is governed by Kentucky law. *See Dunn v. Gordon Food Servs., Inc.*, 780 F. Supp. 2d 570, 576 n.6 (W.D. Ky. 2011). Under Kentucky law, "a legal waiver . . . is a voluntary an intentional surrender or relinquishment of a known right, or an election to forego an advantage which the party at his option might have demanded or insisted upon." *Greathouse v. Shreve*, 891 S.W.2d 387, 390 (Ky. 1995) (quoting *Barker v. Stearns Coal & Lumber Co.*, 291 Ky. 184, 163 S.W.2d 466, 470 (1942)). In determining whether a party's release was knowing and voluntary, courts must consider:

> (1) [the] plaintiff's experience, background, and education; (2) the amount of time plaintiff had to consider whether to sign the waiver, including whether . . . [there was] an opportunity to consult with a lawyer; (3) the clarity of the waiver; (4) consideration for the waiver; [and] (5) the totality of the circumstances.

*Dunn*, 780 F. Supp. 2d at 576-77 (quoting *Williams v. Osborne*, Nos. 2002-CA-000186-MR, 2002-CA-000187, 2003 WL 22927708, at *5 (Ky. Ct. App. Dec. 12, 2003)).

Here, several of these factors weigh in favor of Medtronic. By signing the Separation Agreement, Cima acknowledged that "Medtronic advis[es] her to consult with an attorney prior to executing this Agreeement and . . . that she has been provided the right to consider this Agreement . . . for a period of twenty-one (21) days prior to executing [the Agreement]." [DN 6-1 at 4.] The release provision itself is clear and unequivocal, explicitly stating that Cima releases all her claims against Medtronic. *See* [*id.* at 3-4.] Cima also received consideration for the release, in the form of four weeks' salary and benefits. *See* [*id.* at 2-3.]

However, at the motion to dismiss stage, the Court must accept all of Cima's well-pleaded factual allegations as true, and draw all inferences arising from those facts in her favor. *See Garceau v. City of Flint*, 572 F. App'x 369, 371 (6th Cir. 2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677-79 (2009)). Cima states in her complaint that at the time she signed the Separation Agreement, "she lacked the capacity to enter into a contractual agreement [] because of the psychological conditions that she was still suffering from." [DN 1-1 at 6.] While a bare assertion that Cima lacked capacity would be a legal conclusion that this Court need not accept as true, Cima's complaint goes further. She claims that she underwent mental health hospitalization and treatment in July and August 2014, and that she was still under psychiatric supervision at the time she signed the Agreement. [*Id*. at 5-6.] Further, Cima alleges that her supervisors were aware of her recent psychiatric treatment when Medtronic sought to obtain her release of claims. [*Id*. at 6.] Taken as true, Cima has plausibly alleged that she was unable "to understand and appreciate the consequences" of signing the Separation Agreement. *Conners v. Elbe*, 269 S.W.2d 716, 718 (Ky. 1954). Therefore, at the motion to dismiss stage, Cima's claims are not barred by the Separation Agreement and Release.

### B. Laches

Even if Cima's claims are not barred by the Separation Agreement, Medtronic argues, they are instead barred by laches. "The doctrine of laches bars claims where two elements are present: '(1) lack of diligence by the party against

whom the defense is asserted, and (2) prejudice to the party asserting the defense.'" *Libertarian Nat. Committee, Inc. v. Holiday*, Civil No. 14-63-GFVT, 2014 WL 5106328, at *1 (E.D. Ky. Oct. 6, 2014) (quoting *Costello v. United States*, 365 U.S. 625, 282 (1961)). Under Kentucky law, it is possible for a claim to be barred by laches even when the statute of limitations has not yet run, but in such situations, "one claiming a bar based on delay must also show prejudice." *Plaza Condominium Ass'n, Inc. v. Wellington Corp.*, 920 S.W.2d 51, 54 (Ky. 1996).

Here, Medtronic asserts that "because [Cima] did not promptly challenge the validity of the Separation Agreement but instead sat on her claims for more than a year while retaining the full severance payment, her claims are precluded by the doctrine of laches." [DN 7-1 at 9.] But as Medtronic acknowledges, at some point prior to filing suit, Cima also sent to Medtronic a check in the amount of her severance payment. [*Id.*; DN 1-1 at 7.] Furthermore, Cima alleges that after she retained counsel, she attempted to contact various Medtronic officials regarding her termination, to no avail. [DN 1-1 at 7.] While the precise timeline of these events is unclear, Cima has plausibly alleged that Medtronic should have been on notice of Cima's claims well before she filed suit, and Medtronic has not shown that it has been prejudiced in any significant way. Ultimately, "the delay in the present case is not of such consequence as to harm [Medtronic] to the extent that this claim should not be heard." *Plaza Condominium Ass'n*, 920 S.W.2d at 54. Cima's claims are not barred by laches.

C. Cima's Claims

(1) *Intentional Infliction of Emotional Distress*

Cima's first claim is for intentional infliction of emotional distress (IIED). To prevail on an IIED claim under Kentucky law, the plaintiff must prove four elements: "(1) the wrongdoer's conduct must be intentional or reckless; (2) the conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality; (3) there must be a causal connection between the wrongdoer's conduct and the emotional distress; and (4) the emotional distress must be severe." *Jones v. Glob. Info. Grp.*, No. 3:06-CV-00246-JDM, 2010 WL 1337220, at *5 (W.D. Ky. Mar. 30, 2010) (citing *Kroger Co. v. Willgruber*, 920 S.W.2d 61, 65 (Ky. 1996)). Here, Cima alleges that Medtronic "fail[ed] to properly address [Cima's] serious mental health concerns," "fail[ed] to adequately supervise the conduct of its employees and agents," "fail[ed] to provide the same level or substantially similar level of flexibility and cooperation to an employee suffering from mental health issues," and "fail[ed] to provide [Cima] an opportunity to be heard." [DN 1-1 at 7-8.]

Medtronic points out, correctly, that Kentucky law requires "conduct . . . so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Humana of Ky., Inc. v. Seitz*, 796 S.W.2d 1, 3 (Ky. 1990) (quoting Restatement (Second) of Torts § 46 cmt. d). However, at this early stage of the case, Cima's complaint plausibly alleges a valid IIED claim. Taking as true Cima's version of events, Medtronic knew that Cima had recently undergone

9

significant mental health treatment, and discharged her shortly thereafter. Just five days later, after her termination had caused Cima to relapse back into anxiety and depression, Medtronic obtained from her a release of all claims. Medtronic's actions caused Cima to suffer "severe emotional distress including severe anxiety and severe and crippling depression, occurring on a consistent and persistent basis." [DN 1-1 at 8.] If indeed Medtronic did exploit Cima's fragile mental health to obtain a release, its behavior could conceivably be considered extreme and outrageous. *See Willgruber*, 920 S.W.2d at 67 (quoting Restatement (Second) of Torts § 46 cmt. f) ("[E]xtreme and outrageous behavior 'may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity.'"). Therefore, Cima's IIED claim may proceed.

(2) *Breach of Contract*

Second, Cima brings a breach of contract claim, which requires her to prove "(1) the existence of a valid contract; (2) breach of the contract; and (3) damages or loss caused by the breach." *Am. Towers LLC v. BPI, Inc.*, No. CIV. 12-139-ART, 2014 WL 3818193, at *2 (E.D. Ky. Aug. 4, 2014) (citing *Metro Louisville/Jefferson City Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009)). Cima admits that she was an at-will employee of Medtronic, and as such, Medtronic could "ordinarily discharge [Cima] 'for good cause, for no cause, or for a cause that some might view as morally indefensible.'" *Miracle v. Bell Cnty. Emergency Med. Servs.*, 237 S.W.3d 555, 558 (Ky. Ct. App. 2007) (quoting *Firestone Textile Co. Div., Firestone Tire &*

*Rubber Co. v. Meadows*, 666 S.W.2d 730, 731 (Ky. 1983)). Despite this general rule and the provision in her Employee Agreement that defined her employment as at-will, Cima alleges that she "had another contract with her employer [] regarding the conditions that she would operate under in order for her to continue her employment." [DN 1-1 at 8.] She also claims that Medtronic "modified its relationship with [Cima] by imposing additional conditions on her continued employment." [DN 8 at 10.]

Those additional conditions are derived from two communications to Cima from Stacie Blankenship, one of her supervisors. *See* [DN 6-3; DN 6-4.] In the first communication, a March 21, 2014 email, Blankenship tells Cima that her work responsibilities will be restructured so that she will have no contact with the doctor with whom she was alleged to have a prior relationship. *See* [DN 6-3 at 2.] In the second, an April 22 letter, Blankenship alleges that Cima has violated Medtronic's expectations by speaking with the doctor while on call. [*Id.* at 2.] Blankenship then states that Cima must comply with the March 21 guidelines and refrain from attempting to contact the doctor during work hours. [*Id.* at 3.] Specifically, Blankenship says, "I am here to fully support you in this situation. Please let me know if there is anything that I can do to help you meet these expectations and improve in the areas of concern as described above." [*Id.*] She says that "there will be zero tolerance for failure of these expectations," and "any negative issues that arise in the future from preventable actions" will "subject [Cima] to further disciplinary action up to and including termination." [*Id.*]

11

Blankenship does not explicitly state that Medtronic is extending Cima an offer of employment for a definite term or imposing a for-cause termination requirement. However, taking Blankenship's statements together and construing them in Cima's favor, Blankenship does imply that if Cima complies with Medtronic's "expectations going forward," [DN 6-3 at 1], her employment will be secure. For instance, Blankenship states that she will schedule a performance review to see if Cima is complying with the additional employment conditions. [DN 6-3 at 3.] The Court recognizes that under Kentucky law, "an at-will employment relationship can be modified only if the employer clearly states an intention to do so." *Worden v. Louisville and Jefferson Cnty. Metro. Sewer Dist.*, 847 F. Supp. 75, 77 (W.D. Ky. 1994). Although the Court has serious doubts regarding whether Blankenship's statements altered the nature of her employment relationship with Medtronic, Cima's allegations at this early stage of the case are sufficient to allow her breach of contract claim to go forward. *See Hammond v. Heritage Comm., Inc.*, 756 S.W.2d 152 (Ky. Ct. App. 1988) (at-will employee could state breach of contract claim when she received oral permission to pose for *Playboy* magazine, but was subsequently fired). Discovery will allow the Court to place Blankenship's statements in the proper context, and it may very well establish that Cima cannot show that Medtronic breached its contract with her. For now, though, her breach of contract claim may proceed.

(3) *Contractual Interference*

Cima's final claim is styled as "interference with a contractual relationship." [DN 1-1 at 9.] Essentially, Cima contends that Medtronic interfered with its own contract by preventing her "from completing her contractual obligations as an employee." [*Id.* at 10.] Under Kentucky law, to recover against Medtronic under this theory, Cima must prove: "(1) the existence of a contract; (2) [Medtronic's] knowledge of this contract; (3) that it intended to cause its breach; (4) its conduct caused the breach; (5) this breach resulted in damages to [Cima]; and (6) [Medtronic] had no privilege or justification to excuse its conduct." *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1079 (W.D. Ky. 1995). However, Kentucky courts also consistently hold that a party cannot interfere with its own contract. *See, e.g.*, *Rawlings v. Breit*, No. 2003-CA-002785-MR, 2005 WL 1415356, at *3 (citing *Rao v. Rao*, 718 F.2d 219, 225 (7th Cir. 1983)). For that reason, Cima's contractual interference claim must be dismissed. Cima does not allege that Medtronic interfered with her contract with a third party; rather, she claims that Medtronic interfered with the Medtronic—Cima contract. But in the tortious interference context, Kentucky law requires three to tango. Cima cannot recover from Medtronic for its interference with its own contract, so her third claim must be dismissed.

### III. Conclusion

In sum, Cima's complaint plausibly alleges that her recent mental health treatment rendered her incapable of validly executing the Separation Agreement and Release. Although her contractual interference claim is not recognized under Kentucky law, Cima's breach of contract and intentional infliction of emotional distress claims may go forward. While the Court may again address these issues at a later stage of this case, the parties should be afforded an opportunity to take discovery on the validity of Cima's Separation Agreement and on her remaining claims. Therefore, IT IS HEREBY ORDERED:

Defendant Medtronic, Inc.'s motion to dismiss [DN 7] is GRANTED IN PART and DENIED IN PART. Plaintiff Marilyn Cima's interference with a contractual relationship claim is DISMISSED WITH PREJUDICE. Cima's intentional infliction of emotional distress and breach of contract claims may proceed.

A **telephonic status conference** shall be held on **January 11, 2017** at **11:00 a.m. Central Time.** The Court shall place the call to counsel.

CC: Counsel of Record